# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR410-223 |
| | ) | |
| ROBERT ANTHONY QUINONES | ) | |

## REPORT AND RECOMMENDATION

Robert Anthony Quinones, a former member of the United States Army, stands accused of forcing entry to the hospital on Fort Stewart Military Reservation at gunpoint, kidnapping a number of hostages, and threatening to kill the President and a former President. (Doc. 11.) He has moved to suppress the statements he made following his arrest on the ground that he lacked the capacity to waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (Doc. 47). He has further moved to dismiss the indictment for lack of specificity (doc. 40) and to exclude the testimony of a government psychologist under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

A. **Admissibility of Defendant's Statements**

Following his arrest Quinones submitted to interviews by three federal agents. He does not deny that he was formally advised of his *Miranda* rights, executed a written waiver of those rights, and gave consistent and detailed statements to the agents who questioned him. He does not contend that he was coerced into speaking by any form of government pressure or trickery. Rather, the sole basis for suppression of his statements rests on the contention that he "was incapable of giving a knowing, intelligent waiver of his *Miranda* rights due to mental illness and/or intoxication." (Doc. 47 at 2.) The evidence adduced at the suppression hearing does not support this contention.

Both witnesses at the hearing -- Army Criminal Investigation Division ("CID") Agent Aaron Green, and Federal Bureau of Investigation ("FBI") Special Agent Freddie Watkins -- testified that during their entire encounter with defendant he appeared to be in full possession of his faculties and exhibited no signs of irrationality, intoxication, or mental impairment that would call into question his ability to understand his situation, his *Miranda* rights, or his ability to make a knowing and

intelligent waiver of those rights.

Special Agent Green first encountered Quinones at around 4:20 a.m., shortly after he entered the hospital armed with multiple weapons, took several people hostage, and demanded admission to the hospital's mental health unit. At that time Quinones was speaking with an Army major about the problems he was having with the VA in receiving appropriate treatment for his post-traumatic stress disorder ("PTSD"). Agent Green introduced himself and joined in that conversation in an effort to defuse the hostage situation. Quinones appeared to be grounded in reality and exhibited no signs of fantastic or magical thinking. He responded appropriately to questions and explained his motives and intentions. His speech was not slurred, and he maintained full control of his person and the rifle he was carrying. He directed that the window blinds be closed as a precaution against a possible police sniper, carefully checked the Coke cans offered to him to ensure that they had not been tampered with (by the introduction of some drug or sedative), and complied with instructions that he not point his weapon at the surveillance cameras to avoid agitating other law enforcement agents who

3

might be observing the events. He eventually agreed to relinquish his weapons, unloaded them, and allowed himself to be handcuffed.

At around 6:53 a.m., Quinones submitted to a breathalyzer test, which revealed a blood alcohol content of .054 (within the legal limit for driving). Agent Green then allowed Quinones to rest for some three hours before transporting him to an interview room at the CID office. There, he removed all restraints and introduced Quinones to FBI Agent Watkins, who advised Quinones of his *Miranda* rights. Quinones stated that he understood his rights and was willing to submit to an interview. He executed a written waiver of his rights. (Gov't Ex. 1.) He was initially questioned by Agent Watkins for less than an hour and then questioned in more detail by Agent Green for another two hours. Using a laptop computer, Agent Green typed out what he considered to be the most critical questions and Quinones' responses to those questions. At no point during the standoff at the hospital or during the later interrogation did Quinones exhibit any unsteadiness or bizarre behavior suggestive of profound intoxication or severe mental impairment. He acknowledged taking various prescription medications and stated that he

had consumed some alcohol prior to coming to the hospital.[1] But he explained that he had no difficulty operating his vehicle or gaining entry to the military reservation through the guard gate. The interview was interrupted at various times by lunch, bathroom, and smoking breaks. During these breaks Agent Green engaged Quinones in casual conversation about matters unrelated to the subject of the interview (such as cars, fishing, and football). At the conclusion of the interview, Agent Green printed out the question-and-answer notes that he had been preparing as the interview proceeded. Quinones then read the statement and signed it. (Doc. 47 at 6-10.)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To safeguard this privilege against self-incrimination, the Supreme Court has long held that statements made in response to custodial interrogation are admissible only if the suspect is advised prior to any questioning "that he has a right to remain silent, that any

---

[1] Quinones was able to identify both the generic and trade names of these drugs with great precision, as well as the conditions they were prescribed to treat. (Doc. 47 ex. A (Quinones' sworn statement).) He indicated that he had consumed 4 or 5 drinks of vodka and Coke but had ceased drinking around midnight. (*Id.*)

5

statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. The suspect may effectively waive these rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* There are two distinct aspects to such a waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Dunkins v. Thigpen*, 854 F.2d 394, 398-99 (11th Cir. 1988).

Here, Quinones does not argue that his confession was involuntary due to any form of law enforcement coercion or overreaching. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to a finding that a confession is not voluntary"). Rather, he argues that his mental impairment, together with the undisputed fact that he had consumed drugs and alcohol sometime prior

6

to the interrogation, precluded him from making a knowing and intelligent waiver of his *Miranda* rights. Quinones, however, has failed to refute the government's evidence establishing that, on this particular occasion, he was fully capable of appreciating both the nature of his rights and the consequences of waiving them.

It is well settled that neither mental illness nor the consumption of intoxicants necessarily invalidates a *Miranda* waiver. While mental impairment "is a factor to be considered by the trial court when ruling on the validity of a waiver," even a suspect's mental retardation does not preclude a finding that he voluntarily and intelligently waived his privilege against self-incrimination. *Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir. 1988) (19-year-old functionally illiterate and moderately retarded suspect understood his *Miranda* rights and knowingly waived them); *Devier v. Zant*, 3 F.3d 1445, 1460 n. 46 (11th Cir. 1993) (suspect's waiver was knowing and intelligent despite low mental functioning where "nothing in the record . . . suggest[ed] that he was so impaired as to not understand the meaning of the *Miranda* warnings"); *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (neither suspect's mental impairment

nor his alcohol and drug consumption prevented him from making a voluntary and knowing waiver of his *Miranda* rights); *United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir. 1990) (suspect with dependent personality disorder and who had a history of emotional problems and addiction to prescribed medications made a valid waiver of his *Miranda* rights); *see also United States v. Burson*, 531 F.3d 1254, 1257-59 (10th Cir. 2008) (defendant's prior methamphetamine use and tiredness did not preclude a knowing and intelligent waiver of his *Miranda* rights); *United States v. Cristobal*, 293 F.3d 134, 138-43 (4th Cir. 2002) (suspect interviewed the day after he suffered multiple gunshot wounds, and while he was taking pain killers and narcotics, was nevertheless capable of making a knowing and intelligent waiver of his *Miranda* rights). As the Tenth Circuit has put it, "a defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." *Burson*, 531 F.3d at 1258. Thus, it is not sufficient for a defendant merely to show that he had been taking narcotics or other intoxicants; rather he must establish that consumption of such substances had the actual "effect" of rendering a *Miranda* waiver

"unknowing or unintelligent." *Cristobal*, 293 F.3d at 142. Nor is it sufficient for a defendant challenging a *Miranda* waiver to show that his "intoxication *could have* impaired him to the point that his confession cannot be considered 'a product of a free mind and rational intellect.'" *Morris v. Bell*, 2011 WL 7758570 at *46 (N.D. Tenn. 2011). Instead, the record must establish that, due to a mental disorder or some intoxicant, the defendant was *in fact* unable to comprehend and effectively waive his rights.[2]

There is no evidence in this record that Quinones was substantially impaired at the time of his interrogation. The agents who testified at the suppression hearing had the opportunity and the incentive to observe Quinones closely over a period of several hours. At no point either during the events at the hospital or during his later interview did he exhibit any signs of confusion, exhaustion, incoherence, or irrational thought patterns. The agents' testimony that he was alert, oriented, and able to

---

[2] At the hearing defense counsel noted that the Quinones' psychological expert had opined that the medications he was taking, particularly when combined with alcohol, "*could have*" produced "a 'blackout'" or "altered state that diminished his capacity to appreciate his actions." (Doc. 23-1 at 11 (emphasis added).) Nowhere in her report, however, did that expert conclude that Quinones was in fact unable to understand or knowingly waive his *Miranda* rights.

9

converse normally and act appropriately was credible and uncontroverted. While it is undisputed that Quinones suffers from PTSD and had consumed both antianxiety medications and alcohol prior to coming to Fort Stewart, a suspect's competency to make a *Miranda* waiver may not be determined by viewing such facts in isolation but may only be assessed by considering the totality of the circumstances. Here, viewing the evidence as a whole, the government has demonstrated by a preponderance of the evidence, *see United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996), that Quinones was fully capable of understanding his *Miranda* rights and that he made a free, rational, and deliberate choice to waive those rights and submit to an interview. The motion to suppress his statements is without merit and must be **DENIED**.

**B.  Sufficiency of the Indictment**

Quinones contends that the indictment "lacks sufficient specificity as to provide notice of the charges alleged and allow preparation of a defense." (Doc. 40 at 1.) A review of the indictment establishes otherwise.

Pursuant to Fed. R. Crim. P. 7(c)(1), an indictment need only

provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and cite the statute the defendant allegedly violated. In other words, notice pleading suffices. *Russell v. United States*, 369 U.S. 749, 762 (1962) (one of the chief aims of the Rule was to put an end to "the rules of technical and formalized pleading which had characterized an earlier era"); CHARLES ALAN WRIGHT & ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE § 123 (4th ed. 2008) (fine detail at the pleading stage is no longer required). But the Rule's lightened pleading burden in no way modifies the fundamental functions of a written charge. Constitutionally, an indictment must inform the accused "of the nature and cause of the accusation." U.S. Const. amend. VI. And this notice must set forth the elements of the offense "without any uncertainty or ambiguity." *United States v. Carll*, 105 U.S. 611, 612 (1881). By including each element, the indictment serves another purpose: forestalling any subsequent prosecution for the same offense, as prohibited by the Fifth Amendment's Double Jeopardy Clause. These fundamental precepts are so critical that an indictment's sufficiency is determined solely in reference to them, rather than analyzing its technical

sufficiency. *United States v. Poirier*, 321 F.3d 1024, 2029 (11th Cir. 2003); *United States v. McGarity*, 699 F.3d 1218, 1235-36 (11th Cir. 2012). Hence, an indictment must: (1) present the essential elements of the charged offense, (2) notify the accused of the charges to be defended against, and (3) enable the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974).

Here, Quinones does not contest that each charge tracks the language of the statute and presents the essential elements of each offense. He asserts, however, that Counts One through Eleven fail to identify the basic facts underlying the charges, thus depriving him of the ability to mount an adequate defense. (Doc. 40 at 3.)

Counts One, Three, and Five are admittedly a bit unwieldy. They specify that on September 6, 2010, on Fort Stewart, Quinones unlawfully seized three different individuals who were "engaged in and on account of" their official duties in order to obtain unauthorized access to Winn Community Hospital "and otherwise." (Doc. 11 at 1 (Count One:

"Sergeant H.E.H."), 2 (Count Three: "Major S.S."), & 3 (Count Five: "Specialist N.H.A.").) Quinones claims that these charges are wanting, since they "provide no description of the 'official duties' involved, nor do they offer any explanation for the basis of the conclusion that [the] alleged conduct was carried out 'on account of' such duties." (Doc. 40 at 5.) Similarly, he takes issue with the "and otherwise" portion of the charge. (*Id.*) Counts Two, Four, and Six through Eleven charge multiple counts of assault. (Doc. 11 at 1-5.) Those counts simply state that on September 6, 2010, Quinones assaulted, using a deadly weapon, several individuals "engaged in and on account of" their official duties. (*Id.* at 2 (Count Two: "Sergeart H.E.H."), 2-3 (Count Four: "Major S.S."), 3 (Count Six: "Specialist N.H.A."), 4 (Count Seven: "Specialist D.M.B."; Count Eight: "Special Agent Aaron Green"), 4-5 (Count Nine: "L.M.C."), 5 (Count Ten: "DCD"; Count Eleven: "L.N.S.").) Quinones states that the indictment must include more.

The Court is not persuaded that the charges are faulty. They incorporate the elements of the offenses, are definite as to time, place, means, and motivation, and allege the necessary scienter and

13

jurisdictional components. In other words, they are sufficiently specific to apprise the defendant of the charges against him, and they can be relied upon to shield him from further prosecutions for the same crimes. *See, e.g., United States v. Sandoval*, 347 F.3d 627, 634 (7th Cir. 2003) (kidnapping charge sufficient where it did little else than track the statutory language, provide dates, give a rough location, and name the defendants and victim); *United States v. Adams*, 83 F.3d 1371, 1374-75 (11th Cir. 1996) (similar kidnapping charge upheld); *United States v. Czeck*, 671 F.2d 1195, 1196-97 (8th Cir. 1982) (indictment for assault sufficient where charge tracked language of statute and identified the date, location ("in the State and District of Minnesota"), and victim). Nothing more is required. *See, e.g., United States v. Adkinson*, 135 F.3d 1363, 1375 n.37 (11th Cir. 1998) ("An indictment need do little more than track the language of the statute charged to be sufficient."). Moreover, the "and otherwise" and "engaged in and on account of" language is drawn directly from the text of the kidnapping statute itself, which states that it is unlawful to kidnap "and hold for ransom or reward *or otherwise* any person" when the person is an officer and the conduct is done while

14

the person is "engaged in, or *on account of*" the performance of official duties. 18 U.S.C. § 1201(a) (emphasis added). No additional explication is required. Accordingly, Quinones' motion to dismiss Counts One through Eleven of the indictment (doc. 40) should be **DENIED**.

## C. *Daubert* Motion

Finally, Quinones moves to exclude testimony from Dr. Rodolfo Buigas, a psychologist for the Bureau of Prisons who conducted a court-ordered evaluation of Quinones' present competency and sanity at the time of the offense. (Doc. 48.) Quinones first reasons that Dr. Buigas' anticipated trial testimony is excludable because it "would usurp the jury's role in determining guilt and innocence." (*Id.* at 2.) It is true that Fed. R. Evid. P. 704(b) forbids "an expert witness [from stating] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." But the government has disavowed any intent to have Dr. Buigas offer an opinion as to the ultimate issue and points out that Rule 704(b) does not preclude Dr. Buigas (whose qualifications are unchallenged) from providing expert testimony concerning the nature of

15

defendant's mental disease or defect and the typical effects of such a condition on a person's mental state. (Doc. 49 at 4-5.) Quinones, therefore, has mischaracterized Dr. Buigas' "proposed testimony," in a way that simply sets up a straw man and then proceeds to knock it down.

Next, defendant states that Dr. Buigas' opinions are unreliable since they are not based on sufficient facts or data, and are not the product of the reliable application of proper principles and methods to the facts of the case. (Doc. 48 at 2.) Particularly, he takes issue with Dr. Buigas' reliance upon "hearsay." (*Id.*) Under Fed. R. Evid. 703, an expert is entitled to rely upon facts and data transmitted to him by third parties in formulating his opinion so long as experts in the field reasonably rely on such facts in forming opinions. It is plainly apparent that mental health professionals rely on third party data in preparing their reports. After all, Quinones' own expert has done so. In any event, Quinones is protected from the admission of those facts under both the hearsay rule and Rule 703 itself. If the facts underlying the opinion involve inadmissible hearsay, they may only be disclosed to the jury "if their probative value in helping the jury evaluate the opinion substantially

outweighs their prejudicial effect." Fed. R. Evid. 703. Moreover, much of Dr. Buigas' opinion rests on a comprehensive evaluation of defendant's medical and mental condition that involved the use of sophisticated brain imaging technology and standard psychological testing techniques. The information gained by Dr. Buigas and his staff through such methods does not constitute "hearsay."

For the reasons explained above, Quinones' *Daubert* motion (doc. 48) should also be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 22nd day of May, 2012.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA